# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>A black Cloud cellphone with clear screen protector, no case designated as FBI number 1B120 (Target Device 1) and believed to used by Ingrid SHOAF | ) ) ) ) ) ) )  Case No. '25 MJ2750 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the  Southern  District of  California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846<br>18 U.S.C. §§ 922(a)(1)(A),(B),<br>(d), (g), 18 U.S.C. § 2 | Distribution and Possession with Intent to Distribute a Controlled Substance;<br>Conspiracy to Distribute a Controlled Substance, Felon in Possession of<br>Firearm/Ammunition, Dealing, Importing or Manufacturing Without License |

The application is based on these facts:
See attached Affidavit of FBI Special Agent Veronika Fischer.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Veronika Fischer*
Applicant's signature

Veronika Fischer, FBI Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by  Telephone  *(specify reliable electronic means)*.

Date: May 19, 2025

[Judge's signature]
Judge's signature

City and state:  San Diego, CA    Hon. Valerie E. Torres, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT in Support of Cellular Telephone Search Warrant**

I, Veronika Fischer, being duly sworn, hereby state as follows:

**I.**

**INTRODUCTION**

1. This affidavit supports an application for a warrant to search the following electronic devices ("**Target Devices**"):

- One black Cloud mobile cellular telephone with clear screen protector and no case designated as Federal Bureau of Investigation (FBI) evidence item number 1B120 (**Target Device 1**), as described in Attachment A-1, and
- One blue Sky Devices mobile cellular telephone with clear screen protector and clear case designated as FBI evidence item number 1B118 (**Target Device 2**), as described in Attachment A-2,

incorporated herein by reference, and seize evidence of crimes, specifically Title 18 U.S.C. § 922(g) – Felon in Possession of Firearm/Ammunition, Title 21, United States Code, §§ 841, and 846 – Conspiracy to Distribute and Distribution of a Controlled Substance, Title 18, U.S.C., § 922(a)(1)(A), (B) – Dealing, Importing or Manufacturing Without License, Title 18, U.S.C., § 922(d) – Unlawful Sale, and Title 18, U.S.C. §§ 2 – Aiding and Abetting ("**Target Offenses**"), as described in Attachments B-1 and B-2.

2. The **Target Devices** were both located on the body of Ingrid Rene SHOAF during searches incident to arrest on two separate days. **Target Device 1** was seized from Ingrid SHOAF (the "**Target Subject**") after a probable cause arrest was conducted by Deputies of the San Diego Sheriff's Office on December 11, 2024. **Target Device 2** was seized from **Target Subject** after the service of a federal arrest warrant by Special Agents of the FBI on January 28, 2025. A factual explanation supporting probable cause follows. The **Target Devices** are currently in the custody of the FBI.

3. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my

1

review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## II.
## EXPERIENCE AND TRAINING

4. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Section 2516 of Title 18 of the United States Code.

5. I have been a Special Agent with the FBI since October 2022. I am currently assigned to the San Diego Field Division working as a member of the San Diego East County Regional Gang Task Force in El Cajon, California. My duties include the investigation and apprehension of individuals involved in violent gang-related activities as well as drug trafficking and distribution. Prior to joining the FBI, I worked for the Texas Department of Public Safety Crime Laboratory. I hold a Bachelor of Science in Chemistry and Master of Science in Criminal Justice from the University of Southern California.

6. I received twenty (20) weeks of training at the FBI Academy in Quantico, Virginia. During that training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. Through my employment as an FBI Special Agent, I have become familiar with and have participated in all the traditional methods of narcotics investigations, including, but not limited to: visual surveillance, questioning of witnesses, the use of search warrants, handling of informants and cooperating witnesses, pen registers, monitoring Title III interceptions, and undercover operations.

7. As an FBI Special Agent, I have performed or participated in various tasks which include, but are not limited to:

   a. Functioning as a surveillance agent and thereby observing and recording movements of persons, including gang members, trafficking in illegal drugs and weapons, and those suspected of trafficking in illegal drugs and weapons;

   b. Tracing monies and assets gained by drug traffickers, including gang members, from the illegal sale of drugs and weapons (laundering of monetary instruments);

   c. Interviewing witnesses, cooperating individuals, and informants relative to the illegal trafficking of drugs and distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments); and;

   d. Supervising, as a case agent/co-case agent, specific investigations involving the trafficking of drugs and laundering of monetary instruments.

8. As an FBI Special Agent, I have participated in arrests for narcotics-related and gang-related offenses. I have participated in investigations that involved various investigative techniques, such as undercover operations, the use of confidential informants, the purchase of controlled substances and firearms, the execution of search warrants, surveillance in connection with narcotic investigations, or interviews of confidential sources. Through training and participation in these investigations, I have gained valuable insight into the typical makeup and operation of gangs and drug and firearm trafficking organizations and the various methods these organizations use to carry out their violent crime and drug trafficking activities.

9. As a result of my training and experience, I know that drug and firearm traffickers and gang members communicate using cellular telephones, including utilizing prepaid calling cards, direct connect (radio-to-radio), and texting capabilities. I also know that drug and firearm traffickers often change phones to evade detection by

law enforcement. Moreover, I know that drug traffickers get phones from third parties and/or oftentimes subscribe to them in fictitious names in order to mask the true identities of the individuals using the phones.

10. Based upon my training and experience as an FBI Special Agent, and consultations with law enforcement officers experienced in drug trafficking and firearm investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers, illegal firearm traffickers, possessors, and sellers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug traffickers, illegal firearm traffickers, possessors, and sellers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug traffickers, illegal firearm traffickers, possessors, and sellers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    e. Drug traffickers, illegal firearm traffickers, possessors, and sellers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units.

    f. Drug traffickers, illegal firearm traffickers, possessors, and sellers and their co-conspirators often use cellular/mobile telephones to communicate with drivers who transport their illicit cargo and/or proceeds.

    g. Drug traffickers, illegal firearm traffickers, possessors, and sellers and their co-conspirators often use portable Wi-Fi/hotspot devices. Wi-Fi hotspots are internet access points that allow the drug traffickers to connect to a Wi-Fi network, which are "pocket-sized" mobile routers that allow the connection

    to the internet, via Wi-Fi. This allows the traffickers to make phone calls, via Wi-Fi from anywhere, and limit their personal/identifying data to be detected.

 h. The use of cellular telephones by drug traffickers, illegal firearm traffickers, possessors, and sellers and their conspirators tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

11. Based upon my training and experience as an FBI Special Agent, and consultations with law enforcement officers experienced in drug trafficking, illegal possession of firearms, and illegal firearm sales and trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

 a. tending to indicate efforts to possess and/or transport with the intent to distribute federally controlled substances within the United States;

 b. tending to indicate efforts to sell, acquire, and possess firearms, ammunition, or firearm parts;

 b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to distribute federally controlled substances or firearms, ammunition, or firearm parts within the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in possession and/or transportation with the intent to distribute federally controlled substances or firearms, ammunition, or firearm parts within the United States;

    d.    tending to identify travel to or presence at locations involved in the possession and/or transportation of federally controlled substances or firearms, ammunition, or firearm parts within the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify bank accounts, facilities, cellular applications, and other means used to launder monetary proceeds gained from the sale of federally controlled substances or firearms, ammunition, or firearm parts;

    f.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    g.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

### III.
### FACTS SUPPORTING PROBABLE CAUSE
### November 22, 2022 – Controlled Purchase of Firearm

12. A Confidential Informant (CI[1]) for the East County Regional Gang Task Force (ECRGTF), at the direction of officers and agents, reached out to a male subject

---

[1] The CI has been working with the FBI since approximately 2022 and has prior experience working with law enforcement in a similar capacity for over 10 years. The CI is working with law enforcement in exchange for immigration benefits. The CI has not been promised that his/her cooperation will result in the desired immigration benefits. During his/her time working with law enforcement, the CI has provided investigators with intelligence, conducted controlled purchases, and communicated with potential subjects of investigation. Investigators believe the CI has been truthful and reliable while working with law enforcement. The CI's criminal history includes a 1999 conviction for possession of marijuana for sale for which the CI was sentenced to 120 days jail and three years of probation.

6

1  (UM1). The CI had previously spoken to UM1 who stated that he would sell the CI one
2  pound of methamphetamine for $1,100 and a 9mm semiautomatic firearm for $800.
3       13.     On November 22, 2022, the CI drove to the meet location at the parking
4  lot of 301 Athey Avenue in San Diego, which is within the Southern District of
5  California. UM1 arrived in a vehicle at the meet location and told the CI that he did not
6  have the firearm with him, but that he had talked to the owner of the firearm and that it
7  was a few blocks away. UM1 then left the parking lot to go pick up the firearm.
8  Approximately 14 minutes later, UM1 returned to the parking lot followed separately
9  by a Ford F-150 bearing California license plates and driven by a female later identified
10  as the **Target Subject**. After a brief interaction between the CI, UM1, and the **Target
11  Subject**, the CI entered the **Target Subject**'s vehicle. The **Target Subject** did not have
12  a 9mm semiautomatic firearm but sold the CI a Boito 12-gauge shotgun bearing serial
13  number 511913 instead. The CI provided the **Target Subject** $800 in prerecorded funds
14  in exchange for the shotgun and then exited her vehicle. The **Target Subject** then
15  departed the parking lot. The transaction between the CI and the **Target Subject** was
16  video recorded.
17       14.     Following the November 22, 2022, controlled purchase, investigators
18  queried the license plates of the Ford F-150 in which the controlled purchase occurred.
19  That records query revealed the Ford F-150 was registered to the **Target Subject**.
20  Additionally, investigators obtained the **Target Subject**'s California DMV photograph
21  and showed it to the CI. The CI confirmed to investigators that the **Target Subject** is
22  the individual the CI purchased the shotgun from on November 22, 2022.
23       15.     The firearm was seized and inspected. Preliminary checks revealed that the
24  firearm was not manufactured in California. Therefore, the firearm traveled in, and/or
25  affected interstate commerce to arrive in the state of California.
26  **December 11, 2024 – Search Warrant at 3724 Clavelita Street, San Diego, CA**
27       16.     On November 26, 2024, Deputies with the San Diego Sheriff's Office
28  received a report that an individual identified as the **Target Subject** had thrown a rock

7

through a window of a residence and had threatened the occupants of that residence both verbally and by brandishing a firearm. Deputies then conducted a records check of the **Target Subject**, which revealed her criminal record. That records check also revealed 3724 Clavelita Street, San Diego, California 92154 (the "Residence") as the **Target Subject**'s most recent address. The Residence is within the Southern District of California.

17. On December 11, 2024, Deputies conducted surveillance of the Residence. Deputies observed the **Target Subject** cleaning a Kia Optima sedan parked in front of the residence. Deputies also observed a second female, later identified as Donna Marie SHOAF, exit the residence before interacting with the **Target Subject** and driving the Kia Optima away from the residence. After Donna SHOAF departed the Residence, Deputies approached the **Target Subject** to conduct a probable cause arrest based on the November 26, 2024, incident. While Deputies approached, the **Target Subject** attempted to evade Deputies by running from the driveway into the Residence. Deputies apprehended the **Target Subject** near the front door of the Residence and subsequently obtained a California state Search Warrant for the Residence. During a search incident to arrest, Deputies located and seized **Target Device 1** from the **Target Subject**'s body.

18. The search warrant was executed at the Residence later in the day on December 11, 2024. Four people were present at the residence when the search warrant was executed, including the **Target Subject**'s mother (initials of F.S.), her brother (initials of D.S.), her nephew (initials of M.G.) and an unrelated female with the initials N.V. N.V. told investigators that the **Target Subject** sleeps in the garage of the Residence and that to N.V.'s knowledge, no one else resides in the garage. F.S. told investigators that the **Target Subject** spends most of her time in the garage of the Residence.

19. During the search of the Residence's garage, investigators found approximately 82.39 grams of a substance that tested presumptively positive for the presence of methamphetamine. That methamphetamine was stored in separate baggies

within multiple drawers near the bed in the Residence's garage. The methamphetamine was separated into approximately nine different plastic baggies. Additionally, investigators found one round of .338 caliber ammunition in a Styrofoam cup next to a AAA membership card with the name "Ingrid SHOAF" and two matching rounds of .338 caliber ammunition in the same drawer as some of the methamphetamine next to the bed in the garage, a piece of equipment used to help aim a firearm near the bed in the garage, and a Glock-style pellet gun near the bed in the garage. Multiple envelopes with the **Target Subject**'s name and listing "3724 Clavelita Street" as her address were also found in the garage.

20. Deputies *mirandized* the **Target Subject** and she elected to speak with investigators. During that interview, the **Target Subject** denied both making the threats described from the November 26, 2024, incident and owning the replica firearm that was found in the Residence's garage. She admitted that she sleeps in the garage of the Residence, but also claimed that "everyone" had access to that garage. She also stated she was aware of the substances found in the drawers in the garage, but stated it was "fake meth" and knew it was fake because she had done methamphetamine before. She also admitted to having approximately 70 bullets of various calibers, including "38," "40," and maybe "9." When asked why she possessed the bullets, she stated she believed she could own the ammunition. When informed she could not legally possess ammunition, she stated it belonged to friends. The **Target Subject** also admitted to owning the firearm aiming device, or "sight," stating that she was going to give it to a friend as a present.

21. Records checks confirmed that the **Target Subject** was previously convicted of multiple felonies including (but not limited to): Possession of a Controlled Substance on or about August 27, 1998, Burglary on or about June 8, 2000, Assault with a Deadly Weapon on or about April 3, 2003, and Bring Controlled Substance into Prison on or about June 29, 2015.

//

9

**January 28, 2025 – Federal Arrest of The Target Subject**

22. On January 24, 2025, the Honorable Barbara L. Major, United States Magistrate Judge, Southern District of California, signed a sealed Complaint and issued a federal Arrest Warrant for the **Target Subject** for violations of Title 18, United States Code section 922(g)(1) – Felon in Possession of a Firearm and Title 21, United States Code section 841(a)(1) – Possession of Methamphetamine with Intent to Distribute. On January 28, 2025, Special Agents of the FBI arrested the **Target Subject** at the Residence. During a search incident to arrest, Agents located and seized Target Device 2 from the **Target Subject**'s body.

23. Based on my training and experience I know that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of the **Target Devices** which may identify other persons involved in drug or firearm trafficking, or illegal firearm possession or sales. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking and firearm investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to narcotics or firearm trafficking, or illegal firearm possession or sales of the **Target Subject**, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, audio files, videos and other digital information are stored in the memory of the **Target Devices**.

24. Further, in my training and experience, and consultation with other law enforcement officers experienced in investigating firearm violations, individuals prohibited from possessing firearms often find that firearms, firearm parts, and ammunition, are not readily available. Therefore, acquisition of firearms, firearm parts, and ammunition by prohibited persons require planning and communication with others who will provide them with these items through illegal means. For this reason, prohibited persons often keep firearms, firearm parts, and ammunition for long periods

of time, months or more, because of the difficulty in acquiring them, and because of their durable nature.

25. Because they are difficult to acquire, prohibited persons often share, sell, and trade firearms, firearm parts, and ammunition with other prohibited persons and criminal associates, and conceal their possession through individuals who are not prohibited, but are willing to aid their illegal possession. This is also common for individuals involved in criminal street gangs and other criminal organizations. In each instance, the transfer of the firearms, firearm parts, and ammunition is often coordinated via cellular telephone. Communications regarding these occurrences happen frequently and are often precipitated by events, such as the firearm being involved in criminal activity, the potential discovery of the firearm during law enforcement contact, or the current owner being detained or jailed and no longer having access. These communications often identify who has the firearms, firearm parts, and ammunition, whether they are willing to sell, trade, or transfer it, and where it is located and/or concealed.

26. Finally, firearm owners, including prohibited persons, often take pictures or videos of their firearms, either for themselves or to send to others, documenting their possession because firearms are often viewed as items of value and/or an indication of status/stature (similar to large amounts of currency, trophies, or collectibles).

27. In this case, I believe that there may be communications between the **Target Subject** and others on the **Target Device** coordinating the acquisition of firearms and ammunition, and the storage and concealment of firearms when the **Target Subject** does not need it or cannot possess it. Finally, I believe the **Target Device** may contain media, including pictures, video, digital messages, and social media posts, documenting the **Target Subject's** possession of the firearm and ammunition.

28. Based on my training and experience, drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual distribution event. Co-conspirators communicate with one another in

11

efforts to ensure success in getting drugs to the distributor who will conduct end-user sales. In this case, I believe the coordination between the **Target Subject** and others yet unknown likely began well before the December 11, 2024, search warrant. Specifically, at least two months before. The total weight of methamphetamine found is a significant quantity and thus necessitates a significant level of coordination and communication in order to sell and/or distribute. Therefore, I respectfully request permission to search **Target Device 1** for evidence of the **Target Offenses** from October 11, 2024 to (and including) December 11, 2024 (the date of the seizure) and **Target Device 2** for evidence of the **Target Offenses** from October 11, 2024 to (and including) January 28, 2025 (the date of the seizure/federal arrest).

## IV.
## METHODOLOGY

29. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not

all the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the devices manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

30. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

31. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## VI.

## PRIOR ATTEMPTS TO OBTAIN INFORMATION

32. The United States is not aware of any prior attempts to obtain the information requested in this warrant by any other means.

## VII.

## CONCLUSION

33. Based on all of the facts and circumstances described above, there is probable cause to conclude that the **Target Subject** used the **Target Devices** to facilitate violations of the **Target Offenses**.

34. Because the **Target Devices** were promptly seized during the arrests of the **Target Subject** and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by the **Target Subject** continues to exist on the **Target Devices**. As stated above, I believe that evidence of the **Target Offenses** will

exist on **Target Device 1** from October 11, 2024 to (and including) December 11, 2024 (the date of the seizure) and, on **Target Device 2**, from October 11, 2024 to (and including) January 28, 2025 (the date of the federal arrest).

    WHEREFORE, I request that the court issue warrants authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A-1 and A-2, and the seizure of items listed in Attachments B-1 and B-2, using the methodology described above.

_____*Veronika Fischer*_____
Special Agent Veronika Fischer
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 19th day of May 2025.

_____
The Honorable Valerie E. Torres
United States Magistrate Judge

14

# ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

One black Cloud mobile cellular telephone with clear screen protector and no case designated as FBI evidence item number 1B120 (**Target Device 1**)

 

**Target Device 1** was seized from Ingrid SHOAF on December 11, 2024. It is currently in the custody of the Federal Bureau of Investigation.

## **ATTACHMENT B-1**

### ITEMS TO BE SEIZED

Authorization to search **Target Device 1**, as described in Attachment A-1, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile devices for evidence described below. The seizure and search of the cellular/mobile devices shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile device will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of from October 11, 2024 to (and including) December 11, 2024:

a. tending to indicate efforts to possess and/or transport with the intent to distribute federally controlled substances within the United States;

b. tending to indicate efforts to sell, acquire, and possess firearms, ammunition, or firearm parts;

c. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to distribute federally controlled substances or firearms, ammunition, or firearm parts within the United States;

d. tending to identify co-conspirators, criminal associates, or others involved in possession and/or transportation with the intent to distribute federally controlled substances or firearms, ammunition, or firearm parts within the United States;

e. tending to identify travel to or presence at locations involved in the possession and/or transportation of federally controlled substances or firearms, ammunition, or firearm parts within the United States, such as stash houses, load houses, or delivery points;

f. tending to identify bank accounts, facilities, cellular applications, and other means used to launder monetary proceeds gained from the sale of federally controlled substances or firearms, ammunition, or firearm parts;

g. tending to identify the user of, or persons with control over or access to, **Target Device 1**; and/or

h. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 18 U.S.C. § 922(g) – Felon in Possession of Firearm/Ammunition, Title 21, United States Code, §§ 841, and 846 – Conspiracy to Distribute and Distribution of a Controlled Substance, Title 18, U.S.C., § 922(a)(1)(A), (B) – Dealing, Importing or Manufacturing Without License, Title 18, U.S.C., § 922(d) – Unlawful Sale, and Title 18, U.S.C. §§ 2 – Aiding and Abetting.**